**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JAMES BOLAND, as Trustee of, and on behalf of, the Bricklayers & Trowel Trades International Pension Fund,** *et al.*,<br><br>   **Plaintiffs,**<br><br>   v.<br><br>**THERMAL SPECIALTIES, INC., and THERMAL SPECIALTIES ACQUISITION COMPANY, LLC,**<br><br>   **Defendants.** | **Civil Action No. 11-2274 (JEB)** |

**MEMORANDUM OPINION**

When Thermal Specialties, Inc., sold substantially all of its assets to the aptly named Thermal Specialties Acquisition Company, LLC, the acquirer refused to assume TSI's collective-bargaining agreements. In particular, TSAC ended contributions to employee pension funds. Because Superman cannot escape his debts – or his ERISA obligations – by putting on Clark Kent's glasses, courts generally hold employers liable for pension agreements made by their "alter egos." Relying on that alter-ego doctrine, trustees of the pension funds sued TSAC and TSI. All parties now move for summary judgment. In this case, however, TSAC and TSI are not as identical as the superhero and his civilian double. Because their ownership is decidedly different, the Court will grant TSI's and TSAC's Motions and deny Plaintiffs'.

**I.   Background**

For the most part, the evidence in this case is undisputed. As this Opinion ultimately rules for TSI and TSAC, the Court will credit Plaintiffs' evidence where there are disputes and draw justifiable inferences in their favor.

1

A. Factual Background

Robert and Paula Caffey wholly owned TSI for more than 30 years. See Pls. Resp. to TSI Statement of Material Facts (SMF), ¶ 2; Pls. Resp. to TSAC SMF, ¶ 6. A Texas corporation with facilities in Oklahoma and Texas, TSI provided services and products related to industrial furnaces, heat treatment, and insulation. See Pls. Resp. to TSI SMF, ¶ 1. For many years, TSI maintained collective-bargaining agreements with the local and international Bricklayers Union. See Pls. SMF, ¶¶ 1, 5. Indeed, Robert Caffey himself was a long-time member of the Union. See Pls. Resp. to TSI SMF, ¶ 3. Those collective-bargaining agreements required TSI to contribute to Bricklayers-affiliated benefit Funds – including the Bricklayers and Trowel Trades International Pension Fund, the Bricklayers and Allied Craftworkers International Health Fund, and the International Masonry Institute – for each hour of "covered work" performed by TSI employees. See Pls. SMF, ¶¶ 7-10. The trustees of those Funds are Plaintiffs here.

Having actively run TSI for decades, the Caffeys finally decided to retire. See TSI Mot., Exh. 1 (Decl. of Robert Caffey), ¶ 11. In 2008, Robert Caffey hired Mitchell Myers "with the expectation that Myers would later purchase the assets of TSI." Pls. SMF, ¶¶ 11-12. Caffey and Myers defined their relationship through a series of "partnership" and "partnership/equity" agreements. See Pls. Mot., Exh. B (Dep. of Mitchell Myers, Exh. 6 (First Partnership Agreement (Feb. 2008))); Myers Dep., Exh. 7 (Second Partnership Agreement (May 2011)); Myers Dep., Exh. 8 (Third Partnership Agreement (Dec. 2011)). Despite purporting to be "a statement of mutual intention" that was "not intended to be legally binding," see First Partnership Agreement at 2, all parties treat the agreements as an accurate reflection of Caffey and Myers's arrangement. See Pls. SMF, ¶¶ 63-80; TSAC SMF, ¶¶ 14-16; TSI SMF, ¶ 15.

As the First Partnership Agreement explained, Myers had agreed to purchase TSI from Caffey, but uncertainty about the economy and a new facility in Oklahoma City left TSI's value unclear. See First Partnership Agreement at 1. "Therefore, in an effort to allow some time to demonstrate the impact of the above factors to the business valuation and to take an intermediate step toward the aforementioned business transaction, both parties have agreed to a partnership in spirit." Id. During their "partnership in spirit," Caffey and Myers would "share in the responsibility of managing" TSI, with Myers acting as "Managing Partner" in charge of day-to-day management and Caffey acting as "Owner/Investment Partner" in charge of "strategic direction, significant capital investments, and technical consult[ing]." Id. In exchange, during this period they would split TSI's profits evenly. See id.

The Second and Third Partnership Agreements extended these arrangements. The main change over the span of agreements was in the mechanism for distributing those split profits: The First Partnership Agreement contemplated pre-sale distributions to Myers, the Second outlined post-sale distributions to Caffey, and the Third (entered after the sale) set the exact terms of the distribution to Caffey. See First Partnership Agreement at 2; Second Partnership Agreement at 2; Third Partnership Agreement at 2. All three agreements cautioned that they did "not actually create a stock transfer." See First Partnership Agreement at 2; Second Partnership Agreement at 2; Third Partnership Agreement at 2.

In 2009, after Myers had been at TSI for more than a year, the parties signed the initial Asset Purchase Agreement. See Myers Dep., Exh. 3 (Asset Purchase Agreement (APA) (Feb. 18, 2009)). Myers signed on behalf of TSAC, an Oklahoma limited liability company he wholly owned, see Pls. Resp. to TSAC SMF, ¶¶ 1-2, while Caffey signed on behalf of TSI. See APA at 24. In the APA, TSAC agreed to buy substantially all of TSI's assets for $12-13 million. See id.

3

at 1; Pls. SMF, ¶ 16.  Although initially scheduled to close by July 1, 2009, the parties repeatedly pushed that date back, eventually closing on June 30, 2011.  See APA at 2; Myers Dep., Exh. 4 (First Amendment to APA (June 30, 2009)) at 1; Myers Dep., Exh. 5 (Second Amendment to APA (Dec. 6, 2010)) at 1; Pls. Mot., Exh. T (Decl. of Charles V. Mehler III, Attch. 1 (Second Amended and Restated APA (June 27, 2011))) at 2.

Before the sale, Caffey warned his employees that TSI would cease operations on June 30, 2011, and that their jobs would end that day.  See Pls. Mot., Exh. C (Dep. of Robert Caffey, Exh. 3 (Letter from Bob Caffey to TSI Employees)); see also Caffey Dep., Exh. 1 (Letter from Robert Caffey, President, TSI, to Edward Navarro, Bricklayers & Allied Craftworkers Local No. 5 (June 13, 2011)) (similar notice to Union).  Myers, in turn, sent a letter to TSI employees encouraging them to apply to work for TSAC, while cautioning that the terms and conditions of employment – including "job descriptions, policies and procedures, wage structure, benefit plans, etc." – would be "new."  Mehler Decl., Attch. 7 (Memorandum from Mitch Myers, President, TSAC, to All Employees of TSI (May 11, 2011)) at 1; see also TSI Mot., Exh. 27 (Letter from P. Bradley Bendure to Navarro (May 10, 2011)) (similar notice to Union, as well as notice that "the new entities which have been formed by Mr. Myers to purchase the assets of Thermal Specialties, Inc. are not parties to these CBA's and do not intend to assume them").  The turnover went as planned, and on June 30, TSAC bought substantially all of TSI's assets.  Pls. SMF, ¶ 39.

The parties debate the extent to which TSAC mirrored TSI.  According to Plaintiffs, "TSAC took over TSI's business *in toto* . . . with the same offices, equipment, management, customers, subsidiaries, employees, and types of work performed . . . ."  Id., ¶ 41; see also id., ¶¶ 41-45, 48-51.  Myers continued to direct day-to-day operations at TSAC, while Caffey

maintained a limited involvement as a consultant. See id., ¶¶ 50-54. Plaintiffs say, moreover, that "a significant number of TSAC's employees came from TSI." Id., ¶ 47. Defendants, on the other hand, emphasize differences (hotly contested by Plaintiffs) between TSI and TSAC, including TSAC's new emphasis on industrial-furnace design, Caffey's withdrawal from management, TSAC's decision to hire permanent workers, and the limited number of TSI bricklayers who ultimately came to work for TSAC. See TSAC SMF, ¶¶ 32-39, 43-46; TSI SMF, ¶¶ 27-30.

In any event, all agree that there was at least one significant change: TSAC refused to recognize the Union. It would not, consequently, follow TSI's collective-bargaining agreements – and therefore never contributed to the Union-affiliated Funds.

According to Plaintiffs, TSAC's stance on the Union reflected Myers's long-held opposition to unionization. In 2009, Myers asked an employee of the international Union how to get out of the national collective-bargaining agreement. See Pls. Mot., Exh. K (NLRB Confidential Witness Aff. of John McIntyre), ¶ 4. In May 2011, Myers told a TSI manager that "the new company was not going to be a union company." Pls. Mot., Exh. E (Dep. of Kent Charles) at 10:9-11, 14:23-15:12. In June 2011, Myers told a TSI superintendent that TSAC would not be competitive if it were unionized. See Pls. Mot., Exh. G (NLRB Confidential Witness Aff. of Marcus Petherick), ¶ 5. That superintendent had previously heard Caffey advise Myers that the new company should "go non-union because they would then be able to compete." Id., ¶ 7. (All statements by Caffey and Myers quoted here are admissible as statements by party-opponents. See Fed. R. Evid. 801(d)(2). The parties squabble over whether similar statements by Kent Charles, the TSI manager, are admissible. The Court need not resolve that question, however, because those additional statements add nothing.)

B. Procedural Background

Within a month of the sale, the Union filed a charge with the NLRB for unfair labor practices, asserting that TSAC was an alter ego or disguised continuance of TSI and was therefore bound by the existing collective-bargaining agreements. See TSI Mot., Exh. 31 (NLRB Charge No. 17-CA-61737 (July 27, 2011)). After an investigation, the Acting Regional Director of NLRB Region 17 dismissed the charge. See Pls. Mot, Exh. R (Letter from Naomi L. Stuart, Acting Reg'l Dir., NLRB Region 17, to Thomas F. Birmingham (Sept. 28, 2011)). She explained that while TSAC kept substantially the same management, business purpose, operation, and customers, "the lack of substantially identical common ownership, the lack of control of the successor business by the predecessor or its principals and the arms-length nature of the sale precludes a finding of alter-ego status." Id. at 1-2. The NLRB General Counsel affirmed. See Pls. Mot., Exh. S (Letter from Lafe E. Solomon, Acting Gen. Counsel, NLRB, to Birmingham (Dec. 22, 2011)).

Plaintiffs – trustees of the Funds – then filed this suit against TSI and TSAC based on the same alter-ego theory, seeking to hold the companies jointly and severally liable for deficient pension contributions since July 1, 2011. (For those curious why TSI remains in the case: Plaintiffs maintain that TSI "did not go out of business – it simply transferred its operations to a different entity run by the very same person." Pls. Mot. at 18.) Plaintiffs, who were not parties to the NLRB case, argue that their discovery unearthed evidence unavailable to the NLRB that extinguishes any doubts about common ownership. All parties have now moved for summary judgment.

**II.     Legal Standard**

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is

required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, 477 U.S. at 249-50.

**III.    Analysis**

Section 515 of the Multiemployer Pension Plan Amendments Act of 1980, which amended ERISA, "makes a federal obligation of an employer's contractual commitment to contribute to a multiemployer pension fund." Flynn v. R.C. Tile, 353 F.3d 953, 958 (D.C. Cir. 2004). Under section 515, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. In this case, everyone agrees that TSI made all of the contributions required through June 30, 2011. See Pls. Resp. to TSAC SMF, ¶ 48. Plaintiffs, moreover, present only one theory for why TSI and TSAC owe the Funds further contributions: because TSI and TSAC are "alter egos." Liability in this case, therefore, turns entirely on the alter-ego doctrine.[1]

   A.    Alter-Ego Doctrine

Alter-ego liability originated in labor law as an exception to a broader rule. Under that broader rule, when one employer replaces another, the successor employer often has a duty to bargain with the union that represented its predecessor's employees, but the successor is not bound by the prior collective-bargaining agreement. See Fall River Dyeing & Finishing Corp. v.

---

[1] In a footnote, Plaintiffs note that their Complaint also alleged that TSAC was liable as a successor to TSI. See Pls. Mot. at 19 n.7 (citing Compl., ¶ 11). Neither in their own Motion nor in opposing TSAC's and TSI's Motions, however, do Plaintiffs support that allegation. They have therefore forfeited this argument.

NLRB, 482 U.S. 27, 40-41 (1987).  The Supreme Court has laid out the justifications for this regime:

> A potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision.  Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may discourage and inhibit the transfer of capital.  On the other hand, a union may have made concessions to a small or failing employer that it would be unwilling to make to a large or economically successful firm.  The congressional policy manifest in the [National Labor Relations] Act is to enable the parties to negotiate for any protection either deems appropriate, but to allow the balance of bargaining advantage to be set by economic power realities.

NLRB v. Burns Int'l Sec. Servs., Inc., 406 U.S. 272, 287-88 (1972).

That broad rule is easily abused, however.  If employer ABC Corp. (owned by Joe Smith) is unhappy with its collective-bargaining agreement, it can sell its assets to DEF Corp. (also, not coincidentally, owned by Joe Smith) and effectively vacate the labor agreement.  The alter-ego exception prevents such an evasion.  When the successor "is 'merely a disguised continuance of the old employer,'" alter-ego liability binds the successor to the prior agreement.  Howard Johnson Co. v. Detroit Local Joint Exec. Bd., 417 U.S. 249, 259 n.5 (1974) (quoting Southport Petroleum Co. v. NLRB, 315 U.S. 100, 106 (1942)).  Alter-ego liability under section 515 prevents a parallel evasion, "enabling ERISA trustees to recover delinquent contributions from a sham entity used to circumvent the participating employer's pension obligations."  R.C. Tile, 353 F.3d at 958.

To be alter egos, the predecessor and successor must be essentially the same company, separated by only a sham transaction that cloaks the successor's true identity.  See Howard Johnson, 417 U.S. at 259 n.5 (alter-ego cases "involve a mere technical change in the structure or

9

identity of the employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management," where "the successor is in reality the same employer"); id. (an alter ego is created by "a paper transaction without meaningful impact on the ownership or operation of the enterprise"); Fugazy Cont'l Corp. v. NLRB, 725 F.2d 1416, 1419 (D.C. Cir. 1984) ("Under well-established NLRB doctrine, one entity is responsible as the alter ego . . . if an apparent transfer of operations is not an 'arms length' transaction between distinct entities, but merely a sham, creating a 'disguised continuance' of the predecessor's operations.") (citations omitted); Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S., 629 F.3d 282, 288 (2d Cir. 2010) ("Determining that an entity is an alter ego signifies that, for all relevant purposes, the non-signatory is legally equivalent to the signatory and is itself a party to the collective bargaining agreement.") (internal quotation marks and brackets omitted); Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp., 139 F.3d 304, 307 (1st Cir. 1998) ("The alter ego doctrine is meant to prevent employers from evading their obligations under labor laws and collective bargaining agreements through the device of making a mere technical change in the structure or identity of the employing entity without any substantial change in its ownership or management.") (internal quotation marks and ellipsis omitted); Cent. States, Se. & Sw. Areas Pension Fund v. Sloan, 902 F.2d 593, 596 (7th Cir. 1990) ("the alter ego doctrine focuses on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets") (internal quotation marks omitted).

In deciding whether "two nominally distinct unincorporated businesses are alter egos for the purpose of assessing liability under § 515," the D.C. Circuit "evaluate[s] the similarities between the two enterprises in their ownership, management, business purpose, operations,

equipment, and customers," as well as "any transactions or other dealings between the two entities." R.C. Tile, 353 F.3d at 958. "No single factor is controlling, and all need not be present to support a finding of alter ego status." Id. (quoting Belmont Concrete, 139 F.3d at 308). The R.C. Tile panel reserved judgment on whether alter-ego liability should be tougher to obtain when the businesses are incorporated. See 353 F.3d at 958 n.***. That question need not be resolved here, however, as the Court finds that even under the test for unincorporated entities, TSI and TSAC are not alter egos.

    B.  Application to TSI and TSAC

As Plaintiffs note here, TSI and TSAC satisfy many of the factors that R.C. Tile named: they substantially overlap in management, business purpose, operations, equipment, and customers. Yet that tally alone cannot carry the day:

> The [alter-ego] doctrine is not a formalistic mechanism for reflexively regarding distinct jural entities as legally interchangeable whenever the entities' relationship is marked by a sufficient number of the doctrine's characteristic criteria – e.g., continuity of ownership between the corporations, management overlap, similarity of business purpose, evidence that the non-union entity was created to avoid an obligation in a collective bargaining agreement. Rather, the doctrine is a *tool* to be employed when the corporate shield, if respected, would inequitably prevent a party from receiving what is otherwise due and owing from the person or persons who have created the shield.

Mass. Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, Inc., 343 F.3d 18, 21-22 (1st Cir. 2003) (citation omitted). These factors thus boil down, in essence, to one key inquiry: Is the second company really the first, disguised by a sham transaction?

TSI and TSAC, however, clearly are not essentially the same company. The Caffeys wholly owned and controlled TSI, whereas Myers wholly owns and controls TSAC. "While common ownership is not an absolute prerequisite to a finding of alter ego status, it weighs heavily in the alter ego determination." Douglas Foods Corp. v. NLRB, 251 F.3d 1056, 1063

(D.C. Cir. 2001) (citation, emphasis, and internal quotation marks omitted).  The Court is aware that, as Plaintiffs note, courts sometimes find an alter-ego relationship despite new ownership. Those cases, however, involve intrafamily transfers and other sham transactions that change formal ownership while leaving the same person (or group) in control.  See, e.g., R.C. Tile, 353 F.3d at 956, 959 (brothers and one brother's wife); Fugazy Cont'l, 725 F.2d at 1419-20 (actual control remained the same); NLRB v. Omnitest Inspection Servs., Inc., 937 F.2d 112, 118-22 (3d Cir. 1991) (actual control remained the same); Sloan, 902 F.2d at 597-98 (husband and wife); J.M. Tanaka Constr., Inc. v. NLRB, 675 F.2d 1029, 1034-35 (9th Cir. 1982) (extended family); Flynn v. Ohio Bldg. Restoration, Inc., 317 F. Supp. 2d 22, 33-34 (D.D.C. 2004) (husband and wife).

Here, in contrast, TSAC acquired substantially all of TSI's assets in a sufficiently arms-length transaction.  Before the sale, the Caffeys owned the assets of the company; thereafter, Myers and his LLC did.  The only relationship between the Caffeys and Myers was a legitimate business one.  That genuine difference in ownership and control after a *bona fide* transaction proves dispositive.  See, e.g., Howard Johnson, 417 U.S. at 259 n.5 ("There is not the slightest suggestion in this case that the sale of the restaurant and motor lodge by the Grissoms to Howard Johnson was in any sense a paper transaction without meaningful impact on the ownership or operation of the enterprise.  Howard Johnson had no ownership interest in the restaurant or motor lodge prior to this transaction."); Southport Petroleum, 315 U.S. at 106 (no alter egos when there is "a *bona fide* discontinuance and a true change of ownership").

Nor does the evidence here suggest any flim-flammery.  Perhaps most importantly, Plaintiffs never explain why the Caffeys would have wanted to flush money down the drain by selling their business for less than what it was worth.  Unlike a typical sham deal, moreover,

12

negotiations between Caffey and Myers were protracted. They even delayed the sale so that they could better estimate TSI's market value. See First Partnership Agreement at 1 (explaining that Caffey and Myers put off TSI's sale and entered their profit-sharing arrangement "in an effort to allow some time to demonstrate the impact of the [specified] factors to the business valuation"). Caffey and Myers also carefully accounted for and divided hundreds of thousands of dollars of profits in the interim, refining the distribution plan in each partnership agreement. See id. at 2; Second Partnership Agreement at 2-3; Third Partnership Agreement at 2-3.

Pointing to the "partnership" agreements, Plaintiffs argue that Myers was a co-owner of TSI before the sale. But, at core, those agreements created a profit-sharing arrangement – compensation for Myers's work while he and Caffey awaited valuation of TSI's assets. When employers share profits with employees (as they often do), the employees do not become owners. See, e.g., Unif. Partnership Act § 202 (1997) ("[T]he association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership. . . . In determining whether a partnership is formed, . . . [a] person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment . . . for services as an independent contractor or of wages or other compensation to an employee . . . .") (emphasis added). Instead, profit sharing (whether full or partial) pays an employee for her work and aligns the employee's and employer's incentives. It does not provide an employee an equity stake in a company or guarantee him a share of the company when it is sold.

The agreements' wanton use of "equity" and "partner" and "partnership" does not alter that conclusion. Drafted without the aid of a lawyer, the agreements seem to employ "equity" to mean "profits" and "partnership" (or, more precisely, "partnership in spirit") to mean "profit-

13

sharing." The agreements make clear that Caffey retained complete ownership of TSI. See, e.g., First Partnership Agreement at 1 ("Caffey would have the role of Owner/Investment Partner"); id. at 2 ("this agreement is in spirit and will not actually create a stock transfer"); see also Second Partnership Agreement at 1-2 (same); Third Partnership Agreement at 1-2 (same). Myers, moreover, acquired no ownership-like rights that distinguish him from a profit-sharing employee. If Caffey had sold TSI's assets to someone else, for example, there is no indication that Myers would have received compensation for his "ownership interest" in TSI.

The Court's analysis largely tracks the NLRB's. After an investigation of the Union's charge, the Regional Director declined to issue a complaint, explaining:

> The investigation disclosed insufficient evidence to establish that Thermal Specialties Acquisition Company, LLC ("TSAC") is an alter ego of Thermal Specialties, Inc. ("TSI"). Rather, the investigation established separate ownership of the two independent entities and that the transfer of ownership resulted from an arms length transaction between unrelated individuals financed via third party loans.

Letter from Stuart to Birmingham at 1. The General Counsel affirmed this decision:

> [T]he investigation revealed no evidence that the TSAC was formed so TSI could evade its obligations pursuant to its contracts with the Unions. Rather the evidence established that Robert and Paula Caffey were the owners of TSI and decided to retire in 2007. In 2008, they were able to reach an agreement with Mitch Meyers [sic] whereby he would purchase the assets of TSI and start a new company, called TSAC. During the interim, Meyers [sic] served as the General Manager of TSI and conducted the day-to-day operations. After unexpected delays, the parties executed a final purchase agreement in 2011. As a result, TSI ceased to exist and TSAC commenced operations under new terms and conditions of employment. In these circumstances, it could not be concluded that TSAC is the alter ego of TSI.

Letter from Solomon to Birmingham at 1.

TSI and TSAC, in sum, are not alter egos.  Neither was obliged, accordingly, to make additional pension contributions under section 515 of ERISA.  The Court will thus enter summary judgment in favor of TSI and TSAC.

## IV. Conclusion

For the aforementioned reasons, the Court will deny Plaintiffs' Motion for Summary Judgment and grant Defendants Thermal Specialties, Inc.'s and Thermal Specialties Acquisition Company, LLC's Motions for Summary Judgment.  A separate Order consistent with this Opinion will be issued this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  June 19, 2013